

> Signed/Docketed
> November 7, 2011

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 10-41555 MER |
| ANGELA LEE COATES | ) | |
| | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | |

## ORDER

THIS MATTER comes before the Court on the *Motion to Dismiss Debtor's Case Under 11 U.S.C. § 707(b)(1) and § 707(b)(3)* (the "Motion to Dismiss") filed by the United States Trustee (the "UST"), and the *Response to United States Trustee's Motion to Dismiss Debtor's Case Under 11 U.S.C. Section 707(b)(1) and Section 707(b)(3), Request for Hearing and Certificate of Contested Matter* (the "Response"), filed by the Debtor, Angela Lee Coates (the "Debtor").

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b) and 28 U.S.C. § 151.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O), because it concerns the administration of the estate and affects the liquidation of assets of the estate.

## BACKGROUND

### A.    Bankruptcy Filing

On December 18, 2010 (the "Petition Date"), the Debtor filed her voluntary Chapter 7 petition.  Also on the Petition Date, the Debtor filed her Statement of Intent, Certificates of Budget and Credit Counseling, Statement of Financial Affairs and Schedules ("SOFA"), and Statement of Current Monthly Income and Means Test Calculation ("Form 22A").

 On March 21, 2011, the UST filed his Motion to Dismiss, seeking to have the Debtor's case dismissed under the "totality of the circumstances" standard set forth in 11 U.S.C. § 707(b)(3).[1]  Specifically, the UST argues the Debtor's expenses are excessive, and her annual

---

[1]  Unless otherwise specified, all future statutory references in the text are to Title 11 of the United States Code.

salary and bonus provide sufficient disposable income to fund a Chapter 13 plan.  According to the UST, by choosing to continue making $1,121.81 per month payments on a Dodge Ram truck rather than paying her creditors, the Debtor is abusing the Chapter 7 process.

The Debtor contends she has not abused the bankruptcy process.  She asserts her Form 22A accurately represents her income within the six months prior to the Petition Date, qualifying her for Chapter 7 relief.  To that end, the Debtor argues the bonus in excess of $11,000 she received in February 2011, post-petition, was discretionary and not known to her at the time she filed her petition; therefore, she could not account for it on Form 22A.  Further, the Debtor disputes the UST's contention she is the only member of her household, arguing her household includes both her mother and daughter.

This is the Debtor's second Chapter 7 filing.  She previously filed for bankruptcy under Chapter 7 in Utah in 2000 and received a discharge.[2]  The Debtor filed the instant case primarily in response to the garnishment of her wages, which was commenced by HSBC Mortgage Services, Inc. in September 2010.  The garnishment is the result of a default judgment entered against the Debtor in August 2010, following the short sale of the Debtor's home in Highlands Ranch, Colorado, approximately three years prior.[3]  According to the Debtor, with the garnishment, she could no longer afford to pay her bills.[4]

## B.    The Debtor's Employment and Income

The Debtor is employed by USAA as an insurance appraiser, assessing damage to automobiles.  She is paid approximately $5,844 per month.[5]  In addition, the Debtor received a bonus in each of the six years she has worked at USAA.  Her bonus for 2010, which was received in February 2011, was $11,856.70.  However, the Debtor testified her 2010 bonus was unusually high, and typically ranged between $5,000 and $7,000.[6]  Further, the Debtor stated her receipt of a bonus depended not only on her performance, but also the company's performance.  She also stated there might be no bonus for 2011 because of the record number of catastrophes

---

[2]  *Stipulated Facts for Hearing on September 13, 2011* (hereinafter, "Stip. Facts") ¶ 11.

[3]  The Debtor testified at trial the short sale occurred about four years ago.  The default judgment was entered against the Debtor by the Douglas County District Court in Case No. 2010-CV-160.  Though the Debtor's SOFA and Schedule D both indicate the judgment was for a deficiency from a foreclosure, the Debtor testified she had to sell the home she purchased with her boyfriend, Terry Cox, in a short sale, and the judgment is for the deficiency owed after the short sale to HSBC, which held the second mortgage lien on the house.

[4]  The Debtor lists no priority unsecured obligations on her Schedule E, but owes approximately $87,223 in unsecured debts.  Stip. Facts ¶¶ 12, 13.

[5]  The Debtor's Schedule I indicates  she earns $5,070 per month, but the evidence at trial, including the Debtor's pay stub (ex. 8 at 2) established her average rate of pay per month is actually $5,844.  *See* UST Ex. 13-15 n.1 (showing calculation of income).

[6]  The Debtor testified the lowest bonus amount she has received is $3,000.

this year, including disasters on the East Coast and in Texas, where USAA has a significant number of policyholders.

## C.      The Debtor's Living Situation

The Debtor lives in a rental property located on two acres in Parker, Colorado, which she leases with her boyfriend, Terry Cox ("Cox") with whom the Debtor describes as having a "volatile relationship.  The monthly rent for the house is $1,795.[7]  When she filed for bankruptcy, the Debtor and Cox were not living together.  However, four months later (at the time when she and Cox signed the lease), they were again co-habitating, and the Debtor hoped eventually to buy the property with Cox.[8]  At the hearing five months thereafter, the Debtor and Cox were again separated, and Cox was not contributing to lease payments nor other expenses associated with the property. [9]

The Debtor's mother and 22-year-old daughter live with her.  The Debtor's mother moved in with the Debtor six or seven months prior to her filing for bankruptcy[10] because she needed care after falling, hitting her head, and cracking some ribs.[11]  The Debtor testified her stepfather is elderly and unable to care for her mother, and she thought it best for her mother to stay with her and her daughter while she recuperates.  She noted the closest hospital to her mother's home in Moab, Utah, is an hour and a half away in Grand Junction, Colorado, and that her mother needs physical therapy and other care which would not be available to her if she remains at home.  The Debtor said her mother does not have the family resources in Moab she needs to facilitate her recovery.

---

[7]  Ex. 10A.

[8]  The Debtor maintains a life insurance policy on Cox.  Further, Cox's health insurance premiums are paid through the Debtor's work health plan.  However, as the Debtor has a "family plan," it does not increase her premiums to include him on the plan with her and her daughter.  Further, according to the Debtor, USAA provides health insurance to its employees and their significant others, regardless of marital status.

[9]  The Debtor did not include Cox's income in her Schedule I, stating they kept their finances separate and she does not know how much he earns.  Indeed, the Debtor stated she did not want a financial entanglement with Cox because she believes he had not filed taxes in several years was liable for unpaid taxes. The Court does not find this testimony to be credible.  If the Debtor wanted to avoid financial entanglement with Cox, she would not have purchased the Highlands Ranch home with him, nor would she have entered into her current lease with purchase option with him.  Further, in entering into these financial obligations, which would have required the Debtor and Cox to provide financial disclosures, the Debtor would have gained some sense of Cox's financial situation.

[10]  The Debtor's mother lived with the Debtor's sister for three months this summer, while the Debtor's sister, a teacher, was on break from work.  The Debtor testified credibly she made this arrangement with her family so she and her daughter could have a break from caregiving.

[11]  The Debtor testified her mother is in a wheelchair, but can walk occasionally with the assistance of a walker.  She said her mother is very "wobbly," and, although she does not need nursing care, she cannot be left alone and becomes confused when tired.  Further, she needs assistance getting to and from medical appointments.

The Debtor's daughter is the primary caretaker for the Debtor's mother. The Debtor's daughter is not otherwise employed, but is taking online courses to get a license to sell insurance. The Debtor believes her daughter may have earned some money through employment in 2010, but could not say how much. The Debtor pays for her daughter's food, clothing, health insurance, and other basic needs. She also makes all payments on the Jeep Wrangler her daughter drives, and provides insurance, maintenance, and fuel for that vehicle.

**D.      Dependents for Tax Purposes**

The Debtor claims her daughter as a dependent on her tax returns.[12] She does not claim her mother as a dependent, and expects her mother will return to Moab when she is able.

**E.      Vehicles and Vehicle Payments**

The Debtor makes payments of $552.72 per month on the Jeep,[10] which, according to the Debtor, should be paid in full in about a year. The Debtor also makes monthly payments in the amount of $1,112.81 on a 2009 Dodge Ram 2500 Mega Cab.[11] The Debtor has about 54 payments left on the Dodge,[12] and states she owes more on the vehicle than it is worth.[13]

In addition to her vehicles, USAA provides the Debtor with a Ford Fusion, which she uses to visit appraisal sites. She pays $25 per month for use of that vehicle, which she testified can only be used for business. USAA pays to maintain, insure, and fuel the Fusion.

The Debtor asserted she needs the Dodge for landscaping and gardening, and she drives the Ford to and from work. She said her daughter does not need the Wrangler every day, but needs it anytime the Debtor's mother required transportation for medical appointments. According to the Debtor, her daughter does not drive the Dodge, and her mother cannot be transported in that vehicle because the passenger door is too high for her to access.

---

[12] The Debtor testified her mother pays her own taxes and medical bills. She further testified her mother does not contribute financially to the home, as her Social Security checks are sent to her stepfather, who continues to reside in Moab and needs the funds to maintain the home he lived in with the Debtor's mother prior to her injury.

[10] Stip. Facts ¶ 5.

[11] *See also* Stip. Facts ¶ 7.

[12] The Debtor testified the loan on the Dodge was for 72 months.

[13] When the Debtor filed her Schedule B in December 2010, she listed a PT Cruiser valued at $5,775 on her schedule B, in addition to the other vehicles discussed. Further, the Debtor indicated in her Statement of Intent (filed on the Petition Date), that she would retain the 2004 PT Cruiser, subject to a security interest held by the Regional Acceptance Corporation. (Stip. Facts ¶ 8.) The Debtor stated at trial, however, that she was merely a cosigner on the loan for the PT Cruiser, which Cox traded in post-petition for an Audi.

## DISCUSSION

Under § 707(b)(1), a bankruptcy court may dismiss a case filed by an individual debtor, whose debts are primarily consumer debts, if it finds the granting of relief would be an abuse of the provisions of Chapter 7.  A presumption of abuse arises under § 707(b)(2)(A)(i) where the debtor's current monthly income, reduced by certain monthly expenses and multiplied by 60 is not less than the lesser of 25 percent of the debtor's nonpriority unsecured claims or $7,025, whichever is greater, or $11,725.[14]  Where no presumption of abuse arises, as here, a court is to consider whether the debtor filed the petition in bad faith or whether the totality of the circumstances of the debtor's financial situation demonstrates abuse.[15]

Under the totality of the circumstances test set forth in *Stewart v. U.S. Trustee (In re Stewart)*,[16] the Tenth Circuit Court of Appeals held the ability to pay is the primary factor that should be considered by a court evaluating the question of abuse under section 707(b).[17]  However, other relevant factors, such as unique hardship, may also be considered.[13]  Further, in determining whether there is substantial abuse under the totality of the circumstances standard, the Court may consider whether the debtor's expenses can be significantly reduced without depriving her of her adequate food, clothing, shelter, or other necessities.[14]

The UST asserts that, under a totality of the circumstances analysis, the Court should consider the Debtor's $11,856.70 bonus as part of her income, arguing the Debtor's statement of income on Schedule I does not reflect her ability to pay.  The UST also asserts the Debtor has overstated her reasonable expenses on Schedule J, arguing, in particular, the Debtor's $1,121.81 monthly payment on the Dodge is unnecessary because the Debtor has not demonstrated a need for that vehicle.  By reaffirming the debt on the Dodge in Chapter 7, the Debtor has reduced the amount available for payment of her unsecured creditors in a Chapter 13 plan.[15]

---

[14]  11 U.S.C. § 707(b)(2)(A)(i).

[15]  11 U.S.C. § 707(b)(3)(A) and (B).

[16]  175 F.3d 796, 809 (10th Cir. 1999).

[17]  This case was decided well before the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), but continues to inform the Court as to the operation of the standard post-BAPCPA.

[13]  *Stewart*, 175 F.3d at 809.

[14]  *Id.* at 810.

[15]  As the UST notes, in a Chapter 13 case, the Debtor would be required to pay her disposable income into a Chapter 13 plan.  "Disposable income" is defined as that amount which is not reasonably necessary for the support of a Debtor.  11 U.S.C. § 1325(b)(2).

## A.     Reasonable Expenses

The UST begins his analysis of the Debtor's Schedules I and J with the assumption the Debtor has income in the amount of $6,832 per month.  The UST calculated this value, first, by using the year-to-date figure from the Debtor's July 16, 2011 pay stub, dividing by 15 pay periods to get the average pay per pay period, multiplying by 26 for the number of pay periods per year, and then dividing by 12 to arrive at a monthly pay of $5,844.  Then, the UST divided the Debtor's $11,856.70 annual bonus by 12, to arrive at a monthly figure of $988.06. The UST added the monthly bonus figure to the monthly pay figure, concluding the Debtor's gross monthly income is $6,832.

The Debtor finds no fault with the first part of the UST's approach to determining her gross monthly income.  However, the Debtor disputes whether her bonus should be included in the calculation, arguing because bonuses at USAA are discretionary and dependent upon company profits, she may receive a lesser bonus, or no bonus at all, for 2011.

As noted above, the Debtor conceded she has received a bonus for every year she has worked at USAA, ranging from a low of $3,000 to a high of $11,856.70, with the average bonus being in the range of $5,000 to $7,000.  Given the Debtor's consistent receipt of bonuses, the Court concludes bonus income should be considered in determining the Debtor's monthly income.  However, also in light of the Debtor's bonus history, it is not reasonable to anticipate the Debtor will receive a bonus of $11,856.70 for her work in 2011; rather, a bonus more in line with the average should be assumed for purposes of evaluating the totality of the circumstances. Accordingly, the Court concludes the Debtor's receipt of an annual bonus of $5,000 to $6,000 is likely and that bonus income should be considered as part of her gross income for purposes of evaluating the totality of the circumstances in this case.

## B.     Household Size

As noted in *In re Heinze*:

The purpose of the § 707( b)(2) means test is to ensure that debtors repay creditors the maximum that they can afford.  To determine if debtors have sufficient disposable income to repay creditors, debtors' allowable expenses are deducted from current monthly income.  Debtors apply standards based upon the household size to get deductions.  The Bankruptcy Code limits the debtors' monthly expenses to those of the debtor, debtor's spouse and debtor's dependents.  Larger households or those with more "dependents" subtract a greater amount of expenses from the current monthly income resulting in a lesser payment to unsecured creditors.  However, "dependent" is not defined in the Code.[16]

---

[16] *In re Heinze,* 2011 WL 143879 at *2 (Bankr. D. Wyo. Jan. 11, 2011).

In evaluating household size, different courts take different approaches.  This Court agrees with those employing the "dependent" approach, which requires consideration of the reasons a debtor provides support to a claimed dependent, and the reasons the claimed dependent relies on debtor.[17]  In this case, the Court finds the following factors are relevant considerations:  1) the length of time the claimed dependent has resided in the Debtor's household; 2) the reasons the claimed dependent resides in the household; 3) the age of the claimed dependent; 4) the claimed dependent's financial resources and sources of support; 5) whether the dependent is in school or training; and 6) whether the claimed dependent is or could be claimed by the Debtor as an IRS deduction.[18]  The Court is mindful of the direction provided by § 707( b)(2)(A)(ii)(II), which states:

> [t]he debtor's monthly expenses may include, if applicable, the continuation of actual expenses paid by the debtor that are reasonable and necessary for care and support of an elderly, chronically ill, or disabled household member or member of the debtor's immediate family . . . and who is unable to pay for such reasonable and necessary expenses.

The UST argues the Debtor has a household size of one, and her likely payroll tax obligations, utility costs, and other living expenses should be calculated on that basis.  The Debtor disagrees, arguing both her mother and daughter should be included as members of her household.

1.    *The Debtor's Mother*

The Court finds credible the Debtor's assertion her mother came to live with her six or seven months ago because she suffered from a fall and, therefore, has needed rehabilitative therapy and full-time care.  Her testimony is also credible that, given the lack of a nearby hospital, her mother's opportunities for rehabilitation would have been limited in Moab, whereas in Colorado, she has been able to receive physical therapy and medical care.  Further, the Debtor's testimony is credible that her mother's husband is elderly and could not have provided the necessary care for his wife in Utah, while the Debtor's daughter is able to watch over the Debtor's mother during the day and to transport her to and from medical appointments.  Those factors weigh in favor of considering the Debtor's mother a dependent member of the Debtor's household.

Weighing against that conclusion is the Debtor's testimony that her mother lived with the Debtor's sister for three or four months of the past seven, about half the time the Debtor's mother has needed care.  Further, the fact the Debtor's mother pays her own taxes and medical care, and is not the Debtor's dependent for tax purposes, which weighs against finding the Debtor's mother is a dependent.  Also weighing against the Debtor's argument is the fact the

---

[17] *Id.*

[18]  *Id.* at *5-6 (citing *In re Dunbar*, 99 B.R. 320 (Bankr. M.D. La. 1989)).

Debtor's mother's Social Security check goes to her husband each month to maintain their home in Moab. Thus, the Debtor's mother has some financial resources available to her. She is, in effect, supporting herself by contributing to the household to which she hopes to return, rather than supporting herself in the home where she currently resides. While this may be understandable on some level, it is not reasonable to expect the Debtor's creditors to bear the burden of this choice. As a result, the Court concludes the factors weigh against the Debtor's mother's being considered a dependent for purposes of determining the Debtor's reasonable expenses.

### 2.   *The Debtor's Daughter*

The Debtor's daughter is 22 years old. The testimony indicates she is in good health and able-bodied. The Debtor's daughter has completed some college course work, and is taking online courses toward earning her insurance broker's license, but she does not work outside the home. Rather, her full-time occupation is to provide care for the Debtor's mother. By providing such care, the Debtor's daughter provides a benefit both to her mother and grandmother.[19] The Debtor claims her daughter as a dependent on her taxes, and provides her with medical insurance, food, clothing, and other necessities, and the Debtor's daughter resides in the Debtor's home and uses her Jeep Wrangler.

It is reasonable for the Debtor to support her daughter under the circumstances. Though the Debtor's daughter is not the mother's only caregiver, the Court concludes it would be impossible for the Debtor to provide her mother with the necessary care absent the assistance of her daughter. Thus, the Debtor's daughter is in no position to seek employment outside the home to support herself and should be considered a dependent of the Debtor.

### C.   Reasonable Expenses

The question then becomes whether the Debtor's expenses, given her income and household size, are reasonable.

The UST does not quarrel with most of the expenses claimed by the Debtor in her Schedule J.[20] However, the UST takes issue with the Debtor's aggregate vehicle costs of $1,678 per month, well above the IRS standard. The UST is willing to concede the Debtor's need for the Jeep Wrangler, which, it notes, will be paid off in less than a year, but argues the Debtor chose to reaffirm the debt on the Dodge at the expense of her unsecured creditors, who in a Chapter 13 plan would receive substantial payment if the Debtor were not obligated to make

---

[19]   The Debtor testified the cost of a nursing home is $5,000 to $6,000 per month. The Court finds this is a reasonable estimate of the benefit conferred by the Debtor's daughter.

[20]   Indeed, the UST concluded the Debtor's claimed expenses often were too low. Accordingly, in the analyses the UST provided of the Debtor's income and expenses, he adjusted a number of the Debtor's expenses upward.

payments on that vehicle.  The Debtor argues she needs the Dodge because she cannot drive her company vehicle outside of work, and because her daughter needs to use the other vehicle to care for her mother.  The Court does not find this argument compelling.

First, the Debtor and her family would not be deprived of any necessary transportation if she were to give up the Dodge.  Indeed, in the absence of the Dodge, the Debtor would continue to have use of her company's Ford during her working hours, and her daughter would continue to be able to use the Jeep during that time as well.  Outside of work hours, the Jeep would be available to both the Debtor and her daughter, and, in the event of an emergency, the Ford would be available to either the Debtor or, if she were away in the Jeep, her daughter.  Further, since the Debtor's mother cannot climb into the Dodge, the loss of that vehicle would not have any discernable impact on the Debtor's ability to get her mother to her medical appointments.[21] Accordingly, the Court finds the Debtor's retention of the Dodge is not necessary.

Second, it is obvious the Debtor purchased this expensive vehicle not long after the short sale on her home in Highlands Ranch,[22] when she knew or should have known that she still owed money to the mortgage companies holding liens on the short-sold house.  Thus, the Court finds it hard to believe the Debtor had any honest intention of meeting her pre-existing obligations while making payments on the Dodge.  It appears the Debtor filed for Chapter 7 protection, in part, in an effort to keep the vehicle she wants to drive, while avoiding obligations (such as her obligation to her mortgage creditors) she does not want to fulfill, which purpose indicates a substantial abuse of the provisions of Chapter 7 under § 707(b)(1).

The question, then, is whether, with a household size of two and monthly income of $6,261 to $6,344,[23] the Debtor would be able to make a substantial payment to unsecured creditors in a Chapter 13 plan.  The UST provided three summary exhibits[24] in which he analyzed the Debtor's Schedules I and J to calculate her monthly net income based upon household sizes of one, two, and three, respectively, and to illustrate permutations of a Chapter 13 plan.  In each exhibit, the UST assumed the Debtor's average monthly income included one-twelfth of her $11,856.70 bonus, for total monthly income of $6,832.  Further, the UST provided for personal living expenses at the national standard, utilities at the local standard, housing at the Debtor's actual claimed amount, health care expenses at the Debtor's actual claimed amount, renter's insurance at the Debtor's actual claimed amount, and cable or internet at the Debtor's

---

[21]  This is especially true since most medical appointments are scheduled during the week, when the Debtor's daughter would have use of the Jeep to transport her grandmother.

[22]  The Debtor testified 54 payments remain on the 72-month loan term on the Dodge.  This indicates the Debtor bought the Dodge a year and a half ago, about a year and a half after the short sale.

[23]  The Court arrived at these figures by assuming an annual bonus of $5,000 to $6,000 adding $417 ($5,000/12) and $500 ($6,000), respectively, to the $5,844 pre-bonus monthly income figure set forth in the UST's Exhibits 13-15.

[24]  UST Ex. 13, 14, and 15.

actual claimed amount.  The UST excluded the Debtor's claimed costs for student loans and payment of her mortgage deficiency, noting those would be included in plan payments that would be made by the Chapter 13 Trustee.

At trial, the Debtor's counsel asked the UST's case analyst, Krista Hale, who prepared the analyses in the exhibits, to explain what would happen to her calculations if they assumed a reduction in their calculation of the Debtor's gross income of $6,000 annually.  Ms. Hale testified credibly that, in a household of two scenario, if the Debtor's income were reduced to $6,332, the Debtor would be able to pay her unsecured creditors a dividend of 14.02%, or approximately $12,228 under a Chapter 13 plan.  Even assuming the Debtor's monthly income was $70 or so less, the payment to unsecured creditors would still be significant.

## CONCLUSION

By choosing to file under Chapter 7, and by seeking to retain an expensive vehicle rather than committing those funds to the payment of unsecured creditors in a Chapter 13 plan, the Debtor is substantially abusing the protections of Chapter 7.  Accordingly, the Court concludes cause exists to dismiss this case for cause under§ 707(b)(3).  The Court, therefore

ORDERS the Debtor shall convert her case to Chapter 13 within 21 days after entry of this Order, failing which, this case will be dismissed without further notice pursuant to § 707(b)(1).

Dated: November 7, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge